# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

REBECCA TUSHNET,

Plaintiff,

v.

UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

No. 1:15-cv-15-00907 (CRC)

---

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Rebecca Tushnet moves for summary judgment in this case brought under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, on the ground that there is no genuine issue of disputed material fact and that Plaintiff is entitled to judgment as a matter of law. Defendant United States Immigration and Customs Enforcement (ICE) has not demonstrated that it has conducted a search reasonably calculated to uncover the requested records. ICE has also failed to show that records it withheld are exempt from disclosure under 5 U.S.C. §§ 552(b)(4) or (b)(7)(E), or that there is any other basis for withholding them under FOIA. Accordingly, judgment should be entered for Plaintiff.

In support of this Motion, and in opposition to Defendant's Motion for Summary Judgment (Doc. 25), Plaintiff submits the accompanying Memorandum in Opposition to Defendant's Motion for Summary Judgment and In Support of Plaintiff's Cross-Motion for Summary Judgment; Plaintiff's Statement of Undisputed Material Facts, with 24 attached Exhibits; Plaintiff's Response to Defendant's Statement of Undisputed Material Facts; and a proposed Order.

Respectfully submitted,

_____/s/ Michael T. Kirkpatrick_____
Michael T. Kirkpatrick (DC Bar No. 486293)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Phone: (202) 662-9546
Fax: (202) 662-9634
Email: michael.kirkpatrick@law.georgetown.edu

Dated: May 20, 2016                    *Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
REBECCA TUSHNET,                     )
)
             Plaintiff,           )
)       No. 1:15-cv-15-00907 (CRC)
v.                            )
)
UNITED STATES IMMIGRATION    )
AND CUSTOMS ENFORCEMENT,    )
)
             Defendant.     )
_____)

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Michael T. Kirkpatrick (DC Bar No. 486293)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Phone: (202) 662-9546
Fax: (202) 662-9634
Email: michael.kirkpatrick@law.georgetown.edu

Dated: May 20, 2016         *Attorney for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

BACKGROUND ............................................................................................................. 2

   I.   The Impetus for Professor Tushnet's FOIA Request ............................................. 2

   II.   Professor Tushnet's FOIA Request ...................................................................... 5

   III.   ICE's Response to the FOIA Request ................................................................. 6

STANDARD OF REVIEW .............................................................................................. 8

ARGUMENT ................................................................................................................... 9

   I.   ICE Failed to Conduct an Adequate Search for Relevant Records. ....................... 9

      A.   The Inadequacy of ICE's Search is Apparent from the Result, and ICE's Claim that It Cannot Locate Further Responsive Records is Implausible. ................. 9

         1.   ICE's search identified photographs of only a small fraction of the items of clothing seized by ICE as counterfeit during the relevant period, even though seized merchandise is routinely photographed. .................................................... 10

         2.   ICE's search for documents responsive to Request No. 2(a) produced little more than guides submitted by private industry, and it is implausible that ICE has delegated to private industry responsibility for setting policy and training ICE agents to perform their duties related to protecting intellectual property rights... 12

         3.   ICE's search found no documents responsive to Request Nos. 2(b)-(e), 3, or 4, even though the requests were patterned on statements by ICE officials. ........ 13

      B.   ICE Failed to Search Critical Records Systems Where It Knows Responsive Records Could Likely Be Found. ............................................................................. 15

      C.   ICE Did Not Search All Offices Thought to Have Responsive Records, and The Search Terms and Methods Used Varied Widely and Without Any Rational Basis…………………………………………………………………………...16

II.   ICE Has Not Shown that Exemption 7(E) Justifies Withholding Product Guides Provided by Industry Groups. ...................................................................................... 19

   A.   ICE's Vaughn Index and Declaration Lack the Detail Required to Support Redactions Under Exemption 7(E). ......................................................................... 21

   B.   To The Extent The Industry Guides Instruct ICE to Seize as Counterfeit Materials Protected by The Doctrine of Fair Use, The Guides Cannot Be Withheld Under Exemption 7(E). .......................................................................................... 23

   C.   Disclosure of The Techniques and Procedures Described in the Industry Guides Do Not Risk Circumvention of the Law Because They Are Already Known to the Public. .......................................................................................................... 26

   D.   The Industry Guides Do Not Constitute Law Enforcement Techniques, Procedures, or Guidelines, Because They Are Not Internal Agency Materials........ 29

III.   ICE Has Not Justified Its Withholdings Under Exemption 4, So The Redacted Material Must Be Released. .......................................................................................... 30

CONCLUSION........................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases:**

*Am. Immigration Council v. U.S. Dep't of Homeland Sec.*,
    950 F. Supp. 2d 221 (D.D.C. 2013)…………………………..……..…...16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)……………………………………………………....8

*Bagwell v. U.S. Dep't of Justice*,
    No. 15-cv-00531, 2015 WL 9272836 (D.D.C. 2015)……………………......9

*Bally Total Fitness Holding Corp. v. Faber*,
    29 F. Supp. 2d 1161 (C.D. Cal. 1998)…………………………………..….. 3

*Bigwood v. U.S. Agency for Int'l Dev.*,
    484 F. Supp. 2d 68 (D.D.C. 2007)……………………………………………30

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*,
    746 F.3d 1082 (D.C. Cir. 2014) …………………………………………21, 22, 23

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.*,
    886 F.2d 490 (2d Cir. 1989)………………………………………………..…3

*Davis v. U.S. Dep't of Justice*,
    968 F.2d 1276 (D.C. Cir. 1992)……………………………………………26

*DeBrew v. Atwood*,
    792 F.3d 118 (D.C. Cir. 2015) ………………………….……………...….9, 15, 19

*Dep't of State v. Ray*,
    502 U.S. 164 (1991)…………………………………………………………....8

*DiBacco v. U.S. Army*,
    795 F.3d 178 (D.C. Cir. 2015)…………………………………………….....8

*Goldberg v. Dep't of State*,
    818 F.2d 71 (D.C. Cir. 1987)……………………………………………...8

*Jefferson v. Dep't of Justice*,
    284 F.3d 172 (D.C. Cir. 2002)……………………………………………..23

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.*,
    828 F.2d 1482 (10th Cir. 1987)……………………………………………24

*Judicial Watch, Inc. v. Dep't of the Navy,*
    971 F. Supp. 2d 1 (D.D.C. 2013)……………………………………………....8

*Justice Watch, Inc. v. U.S. Dep't of Commerce,*
    337 F. Supp. 2d 146 (D.D.C. 2004)………………………………………26

*Keys v. U.S. Dep't of Justice,*
    830 F.2d 337 (D.C. Cir. 1987)…………………………………………...25

*McGehee v. CIA,*
    697 F.2d 1095 (D.C. Cir. 1983)………………………………………...8

*McKinley v. F.D.I.C.,*
    756 F. Supp. 2d 105 (D.D.C. 2010)……………………………………...30

*Milner v. Dep't of Navy,*
    562 U.S. 562 (2011)……………………………………………………...29

*Oglesby v. U.S. Dep't of Army,*
    920 F.2d 57 (D.C. Cir. 1990)……………………………………………16

*Perez-Rodriguez v. U.S. Dep't of Justice,*
    888 F. Supp. 2d 175 (D.D.C. 2012)……………………………………...16

*Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary and Water Comm'n,
United States-Mexico,*
    740 F.3d 195 (D.C. Cir. 2014)…………………………………………...27-28

*Radiance Foundation, Inc. v. N.A.A.C.P.,*
    786 F.3d 316 (4th Cir. 2015)…………………………………………...3

*Sack v. Dep't of Justice,*
    65 F. Supp. 3d 29, 36 (D.D.C. 2014)……………………………………17

*Sakar Int'l, Inc. v. U.S.,*
    516 F.3d 1340 (Fed. Cir. 2008)…………………………………………3

*SaleHoo Group, Ltd. v. ABC Co.,*
    722 F. Supp. 2d 1210 (W.D. Wash. 2010)…………………………………...3

*Shapiro v. Dep't of Justice,*
    969 F. Supp. 2d 18 (D.D.C. 2013)……………………………………..8

*Stolt-Nielson Transp. Grp. Ltd. v. United States,*
    534 F.3d 728 (D.C. Cir. 2008)……………………………………...28-29

*Summers v. Dep't of Justice*,
   140 F.3d 1077 (D.C. Cir. 1998)………………………………………………....8

*Tax Analysts v. IRS*,
   294 F.3d 71 (D.C. Cir. 2002)………………………………………………..29

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*,
   221 F. Supp. 2d 410 (S.D.N.Y. 2002)………………………………………...24, 25

**Statutes:**

5 U.S.C. § 552………………………………………………………………….....1

5 U.S.C. § 552(a)(4)(B)………………………………………………………...8

5 U.S.C. § 552(b)…………………………………………………………………...28

5 U.S.C. § 552(b)(4)………………………………………………………………..30

5 U.S.C. § 552(b)(7)(E)…………………………………………………………19

**Other Materials:**

2 J. McCarthy, Trademarks and Unfair Competition § 31:38 at 670 (2d ed. 1984)….....24

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff Rebecca Tushnet brought this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, et seq., to compel Defendant United States Immigration and Customs Enforcement (ICE) to produce records responsive to her six-part FOIA request of March 6, 2015. Plaintiff's request seeks records related to ICE's seizure of clothing on the basis that it is counterfeit or infringing. Plaintiff challenges the adequacy of ICE's search for responsive records, ICE's redactions under FOIA Exemption 7(E) of information found on about 300 pages of 24 industry guides totaling 503 pages, and ICE's withholding of eight pages of material under FOIA Exemption 4.

Plaintiff's Motion for Summary Judgment should be granted and ICE's denied. First, ICE has failed to conduct a search reasonably calculated to uncover the requested records. The inadequacy of ICE's search is apparent from the paltry results, and common sense compels the conclusion that ICE has further responsive records. Indeed, ICE does not even claim to have searched a critical record system that houses responsive documents. Further, ICE delegated its search responsibility to individual offices without providing any guidance on how to search or what to look for, resulting in searches that were unreasonably limited, haphazard, and arbitrary, if they were conducted at all. Further, ICE searched only 17 of the 39 offices known to have participated in an operation aimed at the seizure of counterfeit sports apparel, even though each of the 39 offices is likely to have responsive records.

Second, the information ICE redacted from the industry guides is not protected from disclosure by FOIA Exemption 7(E). ICE's declaration and Vaughn Index do not adequately describe the information redacted, but instead use a categorical description to

cover all of the various types of information withheld, and ICE applies a near-verbatim recitation of the statutory standard as its reason for claiming the exemption. Further, to the extent ICE has redacted information from the industry guides that encourages ICE to seize items that are not counterfeit or infringing, but rather are parodies or other uses of trademarks protected under the doctrine of fair use, the material is not protected by Exemption 7(E) because it serves no legitimate law-enforcement purpose. Similarly, to the extent ICE has redacted information that is publicly available and well-known, release of the information does not risk circumvention of the law and it is not entitled to Exemption 7(E) protection. Finally, the industry guides are not protected by Exemption 7(E) because they are not internal agency materials and do not constitute official policy. Rather, the guides reflect the opinions of trademark rights holders and do not establish law enforcement procedures.

Third, ICE has abandoned its claim that eight pages of material may be withheld in full under Exemption 4. Because ICE has failed to even attempt to meet its burden to justify its Exemption 4 withholdings, ICE has waived the claim and the Court should order ICE to produce the documents.

## BACKGROUND

### I.      The Impetus for Professor Tushnet's FOIA Request

On January 29, 2014, Defendant United States Immigration and Customs Enforcement (ICE) held a news conference focused on seizures of counterfeit sports-

related apparel in the days leading up to Super Bowl XLIX. *See* Exh. 1.[1] A resulting article

in the Boston Globe contained this passage:

> The profane debasing of a mascot – and really anything that denigrates a
> team – is guaranteed to be contraband, said Daniel Modricker, a spokesman
> for US Immigration and Customs Enforcement. That "Yankees Suck" T-
> shirt you put on for special occasions? If it uses anything that looks like a
> team or league logo, it probably constitutes trademark infringement.

Exh. 2 at 2. The article caught the attention of intellectual property scholars, including

Plaintiff Rebecca Tushnet, a professor at Georgetown University Law Center, because the

remark attributed to Mr. Modricker is a gross misstatement of the law. *See, e.g.*, *SaleHoo*

*Group, Ltd. v. ABC Co.*, 722 F. Supp. 2d 1210, 1217 (W.D. Wash. 2010) (adding "sucks"

to a trademark prevents confusion about whether the use is authorized and therefore avoids

infringement); *Bally Total Fitness Holding Corp. v. Faber*, 29 F. Supp. 2d 1161, 1165 n.2

(C.D. Cal. 1998) (same); *see also Radiance Foundation, Inc. v. N.A.A.C.P.*, 786 F.3d 316,

319 (4th Cir. 2015) (Lanham Act, to avoid constitutional questions, targets only confusing

uses); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.*, 886 F.2d 490, 495

(2d Cir. 1989) ("the expressive element of parodies requires more protection than the

labeling of ordinary commercial products"). Further, "counterfeiting" is a narrower

category than "infringement." Because parodies do not infringe, by definition they cannot

be counterfeit. *See Sakar Int'l, Inc. v. U.S.*, 516 F.3d 1340, 1346 n.5 (Fed. Cir. 2008)

(elaborating on the distinction). Professor Tushnet contacted Mr. Modricker and requested

"the statutory or decisional authority ICE uses to seize items that 'denigrate' a registered

trademark," and information on the number of items seized on that basis. Exh. 3. Professor

---

[1] Unless otherwise noted, all citations to "Exh." Refer to the Exhibits attached to Plaintiff's
Statement of Undisputed Material Facts.

Tushnet explained that she was "puzzled how 'Yankees Suck' or the like, even using the Yankees colors and font, could constitute counterfeiting." *Id.* Mr. Modricker replied that "if one logo where [sic.] disparaging another logo than [sic.] it would be infringement." *Id.*

The article in the Boston Globe also caught the attention of blogger and UCLA law professor Eugene Volokh, who attempted to contact Mr. Modricker to confirm ICE's position. Exh. 4. Mr. Modricker was unavailable but another ICE Public Affairs Officer confirmed that:

> During our anticounterfeiting effort for the Super Bowl, there are some things that are a dead giveaway. For example, one of the things we have seen is . . . the Dallas star, the Dallas logo, and basically the shirt says 'Dallas suck.' When you see a shirt that is placing one team above another, using the official NFL trademark logos, and placing one team above another or putting down one team versus another, you can tell right away that that's not a legit item. Anything that is a joke at one team's expense, anything that could be in a negative context within the league, is a dead giveaway.

*Id.*

Professor Tushnet continued to seek information from ICE concerning "the statutory or decisional basis for seizing items on the grounds that disparagement constitutes either trademark or copyright infringement," and information on the number of items seized on such grounds. Exh. 5. Following further exchanges with Mr. Modricker, *see* Exh. 6, Professor Tushnet was directed to Joseph M. Liberta, Chief of the Criminal Law Section of ICE's Homeland Security Investigations (HSI) Law Division in the Office of the Principal Legal Advisor. Mr. Liberta stated that:

> ICE HSI Special Agents focus their enforcement efforts on interdicting the cross-border movement of infringing works and counterfeit merchandise in violation of 17 U.S.C. § 506, 18 U.S.C. § 2319, and 18 U.S.C. § 2320, as well as associated violations of U.S. criminal and customs laws. As part of their investigatory process ICE HIS Special Agents will consider the scope of the protected intellectual property as registered with USPTO or the Copyright Office, information from right holders regarding what constitutes

an unauthorized use of their intellectual property, and information gathered as part of an investigation. No single factor is dispositive and will be considered on a case-by-case basis. ICE HSI Special Agents consult with ICE's Office of the Principal Legal Advisor and U.S. Department of Justice attorneys to determine whether probable cause exists in support of a seizure and whether there are defenses under the Copyright Act and Lanham Act, such as potential fair use provisions and federal circuit-specific case law, which influence whether an enforcement effort is pursued by the government.

Exh. 7. Finally, with regard to Professor Tushnet's request for information regarding the number of seizures made on the grounds that the seized items contained disparaging uses of marks, Mr. Liberta stated that Professor Tushnet could pursue the information through a FOIA request. *Id.*

## II.       Professor Tushnet's FOIA Request

On March 6, 2015, Plaintiff submitted a six-part FOIA request that, in large part, tracked Mr. Liberta's explanation of how ICE agents determine whether to seize items thought to be infringing or counterfeit. Specifically, Professor Tushnet's FOIA request sought:

1) All images and descriptions of clothing seized or impounded by ICE as counterfeit from 2012 to the date of the request.

2) All records, guidelines, policies, procedures, or training documents that describe how ICE:

   a. determines how similar one mark must be to another to deem an item bearing a mark counterfeit;

   b. distinguishes between items that are merely infringing items and items that are counterfeit;

   c. uses or considers circuit-specific case law in determining whether an item is counterfeit or infringing;

   d. considers the legal doctrine of fair use in determining whether an item is counterfeit or infringing;

> e.   considers trademark-infringement defenses other than fair use in determining whether an item is counterfeit or infringing.

3) All records that use the words "disparagement," "parody," "distortion," or "tarnishment," or grammatical variants thereof, in connection with trademark rights holders' requests or consultations with trademark rights holders.

4) All records indicating that an item was seized by ICE, in whole or in part, because the item disparaged, parodied, distorted, or tarnished a trademark.

5) All documents, presentations, handouts, and photographs used by ICE in connection with the ICE news conference on counterfeit clothing held the week of January 25, 2015-January 31, 2015, which is described in the article "US agents tackle fake Super Bowl items," written by Nestor Ramos and published in the Boston Globe on January 31, 2015. *See* http://www.bostonglobe.com/metro/2015/01/31/searching-for-tom-bardy-feds-hunt-counterfeiters-before-big-game/SusU4CTQW5nfEC0wvLvkIM/story.html

6) All records referencing Daniel Modricker's paraphrased statement at the news conference described in request number 5 that "[t]he profane debasing of a mascot – and really anything that denigrates a team – is guaranteed to be contraband," including any records reflecting his exact words.

Exh. 8.

## III.    ICE's Response to the FOIA Request

In response to Professor Tushnet's FOIA request, ICE made five rolling productions of material totaling 4,539 pages, consisting of 1,457 pages of text documents and 3,082 photographs of seized items.

On September 30, 2015, ICE produced 523 pages of material, consisting of a 511-page summary table responsive to Request No. 1, Bates Nos. 1-511; ten pages responsive to Request No. 5, Bates Nos. 512-514 and 517-523; and two pages responsive to Request No. 6, Bates Nos. 515-516.[2]

---

[2] The documents produced by ICE on September 30, 2015, are available at: http://instituteforpublicrepresentation.org/wp-content/uploads/2015/12/2015-ICLI-00027-Docs-produced-by-ICE-9.30.15.pdf.

On December 3, 2015, ICE produced 106 pages of material, consisting of 104 pages of industry guides related to identification of counterfeit sports-related apparel responsive to Request No. 2(a), Bates Nos. 524-627; and two pages responsive to Request No. 6, Bates Nos. 628-629.[3]

On February 1, 2016, ICE produced 576 pages of material, consisting of 250 photographs responsive to Request No. 1, Bates Nos. 839-1088; 265 pages of text documents responsive to Request No. 2(a), Bates Nos. 630-716, 777-838, and 1089-1205; and 61 pages of text documents responsive to Request No. 6, Bates Nos. 717-776.[4]

On March 1, 2016, ICE produced 585 pages of material, consisting of 250 photographs responsive to Request No. 1, Bates Nos. 1541-1790; and 335 pages of text documents responsive to Request No. 2(a), Bates Nos. 1206-1540.[5]

On April 1, 2016, ICE produced 2,749 pages of material,[6] consisting of 2,574 photographs responsive to Request No. 1, Bates Nos. 1791-2614 and 2790-4539; and 175 pages of text documents responsive to Request No. 2(a), Bates Nos. 2615-2789.[7]

---

[3] The documents produced by ICE on December 3, 2015, are available at: http://instituteforpublicrepresentation.org/wp-content/uploads/2015/12/2015-ICLI-00027-Docs-produced-by-ICE-12.3.2015.pdf.

[4] The documents produced by ICE on February 1, 2016, are available at: http://instituteforpublicrepresentation.org/wp-content/uploads/2016/04/2015-ICLI-00027-Color-Release.pdf.

[5] The documents produced by ICE on March 1, 2016, are available at: http://instituteforpublicrepresentation.org/wp-content/uploads/2016/04/Combined-March-2016-release.pdf.

[6] ICE's cover letter accompanying the production of April 1, 2016, erroneously stated that the release totaled 2,784 pages. *See* Exhibit 11 to Pineiro Decl. of April 29, 2016, Doc. 26-1 at 48.

[7] The documents produced by ICE on April 1, 2016, are available at: http://instituteforpublicrepresentation.org/wp-content/uploads/2016/04/Combined-April-2016-Release-1-of-2.pdf and http://instituteforpublicrepresentation.org/wp-content/uploads/2016/04/Combined-April-2016-Release-2-of-2.pdf.

ICE has produced no records responsive to Request Nos. 2(b)-(e), 3, or 4.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court draws all reasonable inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). FOIA cases are typically resolved on summary judgment. *Shapiro v. Dep't of Justice,* 969 F. Supp. 2d 18, 26 (D.D.C. 2013). FOIA's "strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *Dep't of State v. Ray,* 502 U.S. 164, 173 (1991). An agency may satisfy its burden by affidavit, *DiBacco v. U.S. Army*, 795 F.3d 178, 195 (D.C. Cir. 2015), but "the government must demonstrate the absence of a genuine dispute regarding the adequacy of its search for or production of responsive records." *Judicial Watch, Inc. v. Dep't of the Navy,* 971 F. Supp. 2d 1, 3 (D.D.C. 2013). "The agency bears the burden of establishing that any limitations on the search it undertakes in a particular case comport with its obligation to conduct a reasonably thorough investigation." *McGehee v. CIA,* 697 F.2d 1095, 1101 (D.C. Cir. 1983). The agency also bears the burden of showing that withheld information comes within one of FOIA's nine statutory exemptions, which are to be narrowly construed. *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998); 5 U.S.C. § 552(a)(4)(B). If the government cannot "carry its burden of convincing the court that one of the statutory exemptions appl[ies]," the requested records must be released. *Goldberg v. Dep't of State,* 818 F.2d 71, 76 (D.C. Cir. 1987).

**ARGUMENT**

**I.      ICE Failed to Conduct an Adequate Search for Relevant Records.**

Under FOIA, the agency bears the burden of showing "beyond material doubt that
it has conducted a search reasonably calculated to uncover all relevant documents."
*DeBrew v. Atwood*, 792 F.3d 118, 122 (D.C. Cir. 2015) (internal citations omitted). Here,
ICE attempts to justify its search by reference to a single boilerplate declaration riddled
with errors. *See* Pineiro Decl. of April 29, 2016, Doc. 26. ICE's flawed declaration is
insufficient to support its claim that it conducted an adequate search because common sense
suggests that ICE must have further responsive records, ICE failed to search record systems
and offices where it knows responsive records are likely to be found, and it delegated the
selection of search methods and terms to individual offices resulting in widely disparate
efforts to locate responsive documents.

**A.  The Inadequacy of ICE's Search is Apparent from the Result, and ICE's
Claim that It Cannot Locate Further Responsive Records is Implausible.**

The result of ICE's efforts to produce responsive records demonstrates that ICE
failed to fulfill its obligation to conduct a search "reasonably calculated to uncover all
relevant documents." *DeBrew*, 792 F.3d at 122. A search's failure to uncover material
known to be in the possession of the agency "raises a legitimate question as to thoroughness
of the search." *See Bagwell v. U.S. Dep't of Justice*, No. 15-cv-00531, 2015 WL 9272836,
at *2 (D.D.C. 2015) (finding doubt as to the adequacy of a search where it failed to uncover
a record of communication alluded to in public). The records ICE located and produced
cannot possibly constitute the universe of responsive records. As explained below, to credit
ICE with conducting an adequate search, one would have to believe that 1) ICE agents
seldom photograph items they seize as counterfeit; 2) ICE has delegated to private industry

nearly all responsibility for training and guiding ICE agents in performing their duties related to enforcing intellectual property rights; and 3) no records exist to back up multiple detailed statements by ICE officials regarding ICE's investigatory activities. Because such assertions defy common sense, it is likely that ICE has failed to conduct an adequate search for records responsive to Plaintiff's Request Nos. 1 through 4.

1. **ICE's search identified photographs of only a small fraction of the items of clothing seized by ICE as counterfeit during the relevant period, even though seized merchandise is routinely photographed.**

Plaintiff's Request No. 1 seeks "[a]ll images and descriptions of clothing seized or impounded by ICE as counterfeit from 2012 to the date of the request." Exh. 8 at 1. The parties have already submitted briefs addressing the adequacy of ICE's search for records containing *text* responsive to Request No. 1. *See* Briefs filed as Doc. Nos. 18-21. As explained in those briefs, to locate text records responsive to Request No. 1, ICE searched a single database and produced a 511-page summary table with 40-character-or-less descriptions of the clothing seized as counterfeit, even though ICE admits that it has responsive records with more detailed descriptions which it refuses to produce based on a claim of undue burden. ICE argues that agencies need not comply with FOIA if it would be burdensome to do so. Plaintiff argues that burden alone cannot excuse an agency's noncompliance with FOIA, and ICE has failed to produce evidence sufficient to show undue burden. The parties' dispute regarding whether FOIA requires ICE to produce additional records containing written text responsive to Request No. 1 remains pending.

With regard to *images* responsive to Request No. 1, ICE has *not* asserted that it would be unduly burdensome to comply with the request. Rather, ICE would have this

Court and Plaintiff believe that it conducted an adequate search but turned up only 3,082 photographs of seized items. ICE's contention is laughable.

ICE has admitted that, during the time period relevant to the FOIA request, ICE seized allegedly counterfeit clothing items in 5,564 different seizure incidents, resulting in 1,085 corresponding investigative case files. Pineiro Decl. of Feb. 5, 2016, Doc. 20-1, ¶¶ 9-13. ICE further admits that "[a] single seizure incident could have multiple seized items associated to it." *Id.* ¶ 9. Thus, there are likely far more than 5,564 different clothing items seized as counterfeit by ICE agents during the relevant time period, but ICE has produced only 3,082 photographs. Further, because the photographs ICE has produced reflect multiple shots of the same items from various angles and distances, and multiple shots of the tags attached to each item, the 3,082 photographs relate to only a few hundred different items.[8] It is implausible that ICE would not photograph most items it seizes as unlawful counterfeits, while photographing a small portion of seized items multiple times from multiple angles. Indeed, documents among the records produced indicate that ICE agents routinely send photographs of suspected illegal counterfeit items to industry representatives for consultation, *see, e.g.*, Exh. 9, and it is beyond serious doubt that the 1,085 investigative case files identified by ICE as containing material responsive to the FOIA request contain photographs of the items at issue in the investigation.

---

[8] For example, the 15 photographs bearing Bates Nos. 839-853 are of the same jersey, the 74 photographs bearing Bates Nos. 880-953 are of the same jersey; and the 4 photographs bearing Bates Nos. 1617-1620 are of the same hologram tag.

**2. ICE's search for documents responsive to Request No. 2(a) produced little more than guides submitted by private industry, and it is implausible that ICE has delegated to private industry responsibility for setting policy and training ICE agents to perform their duties related to protecting intellectual property rights.**

Plaintiff's Request No. 2(a) seeks "[a]ll records, guidelines, policies, procedures, or training documents that describe how ICE determines how similar one mark must be to another to deem an item bearing a mark counterfeit." Ex. 8 at 1. In response, ICE has produced 24 industry guides[9] totaling 503 pages.[10] The guides are provided by trademark rights holders to assist ICE agents in distinguishing between authentic and counterfeit merchandise. In contrast to the volume of guidance materials provided by private industry, ICE produced less than 100 pages of its own training materials,[11] none of which bear on the issue of "how similar one mark must be to another to deem an item bearing a mark counterfeit." Ex. 8 at 1. Either ICE has delegated to private industry responsibility for training ICE agents in determining whether an item is counterfeit, or ICE has failed to conduct an adequate search. The latter is more probable.[12]

---

[9] The industry guides bear Bates Nos. 524-627, 630-716, 1089-1106, 1135-1152, 1184-1312, 1530-1535, 2615-2677, and 2681-2758, and are listed on Defendant's Vaughn Index, Doc. 26-1, Exhibit 12, as Entry Nos. 4-8, 10-12, 19, 21-22, 25-28, 33, 35-37, and 39-43.

[10] Neither in the cover letters accompanying its five productions, nor in its declarations, has ICE set forth which documents produced correspond with which requests. However, ICE's counsel has made clear that the industry guides are responsive to Request No. 2(a). In a letter dated October 15, 2015, ICE's counsel stated that the agency had located industry guides responsive to Request No. 2, but had located no documents responsive to Request Nos. 2(b), 2(c), 2(d) or 2(e). Exh. 11 at 2. In a letter dated November 13, 2015, ICE's counsel indicated that the agency had located additional sports apparel industry guides responsive to Request No. 2(a), and had "determined that it should conduct searches for responsive records at additional offices for items responsive to Item 2a through 2e." Exh. 13 at 3.

[11] The ICE training materials bear Bates Nos. 777-838 and 1153-1183.

[12] Even if it is the former, it is important for scholars and the public to know that the government has abdicated its decision-making role, but without confidence in the adequacy of ICE's search, one can only speculate that the government has done so.

### 3. ICE's search found no documents responsive to Request Nos. 2(b)-(e), 3, or 4, even though the requests were patterned on statements by ICE officials.

According to ICE attorney Joseph M. Liberta, ICE agents "focus their enforcement efforts on interdicting the cross-border movement of [both] infringing works and counterfeit merchandise." Exh. 7. Thus, Plaintiff's Request No. 2(b) sought "[a]ll records, guidelines, policies, procedures, or training documents that describe how ICE distinguishes between items that are merely infringing items and items that are counterfeit," Ex. 8 at 1, but ICE's search turned up no responsive documents. Given Mr. Liberta's statement that ICE agents focus on both infringement and counterfeiting, which are legally distinct categories, it is improbable that ICE has no guidelines, policies, procedures, or training documents to help its agents distinguish between the two.

Mr. Liberta also stated that ICE considers "federal circuit-specific case law" as part of the investigatory process, Exh. 7; thus, Plaintiff's Request No. 2(c) sought "[a]ll records, guidelines, policies, procedures, or training documents that describe how ICE uses or considers circuit-specific case law in determining whether an item is counterfeit or infringing," Exh. 8 at 1, but ICE's search turned up no responsive documents. Given Mr. Liberta's statement that ICE considers circuit-specific case law, it is improbable that ICE has no records on the topic.

Mr. Liberta further stated that ICE considers "potential fair use provisions" as part of its investigatory process, Exh. 7; thus, Plaintiff's Request No. 2(d) sought "[a]ll records, guidelines, policies, procedures, or training documents that describe how ICE considers the legal doctrine of fair use in determining whether an item is counterfeit or infringing,"

Exh. 8 at 2, but ICE's search turned up no responsive documents. Given Mr. Liberta's statement that ICE considers fair use, it is improbable that ICE has no records on the topic.

Mr. Liberta asserted that ICE considers "whether there are defenses under the Copyright Act and Lanham Act" as part of its investigatory process, Exh. 7; thus, Plaintiff's Request No. 2(e) sought "[a]ll records, guidelines, policies, procedures, or training documents that describe how ICE considers trademark-infringement defenses other than fair use in determining whether an item is counterfeit or infringing," Exh. 8 at 2, but ICE's search turned up no responsive documents. Given Mr. Liberta's statement that ICE considers defenses under the Copyright Act and Lanham Act, it is improbable that ICE has no records on the subject.

Two different ICE Public Affairs Officers have stated that where an item uses a team logo in a disparaging manner, or places one team logo above another, the item is infringing or counterfeit. *See* Exhs. 3 and 4. Thus, Plaintiff's Request No. 3 sought "[a]ll records that use the words 'disparagement,' 'parody,' 'distortion,' or 'tarnishment,' or grammatical variants thereof, in connection with trademark rights holders' requests or consultations with trademark rights holders," Exh. 8 at 2; and Plaintiff's Request No. 4 sought "[a]ll records indicating that an item was seized by ICE, in whole or in part, because the item disparaged, parodied, distorted, or tarnished a trademark." *Id.* ICE's search turned up no documents responsive to Plaintiff's Request Nos. 3 and 4, but the search did reveal photographs of shirts seized by ICE that disparage a trademark. *See, e.g.,* Exhs. 15, 18, and 19. Given that two different ICE Public Affairs Officers stated that disparagement is indicia of infringement or counterfeiting, and the photographs of seized items indicate that ICE

has seized such material, it is improbable that ICE has conducted an adequate search but found no records responsive to Request Nos. 3 or 4.

### B. ICE Failed to Search Critical Records Systems Where It Knows Responsive Records Could Likely Be Found.

ICE failed to fulfill its obligation to conduct a search "reasonably calculated to uncover all relevant documents," *DeBrew*, 792 F.3d at 122, because ICE failed to search the 1,085 investigative case files underlying the 5,564 seizure incidents identified in the summary table ICE produced bearing Bates Nos. 1-511. The underlying investigatory case files likely include photographs of seized clothing responsive to Plaintiff's Request No. 1, and the case files may also include records responsive to Request Nos. 2, 3, and 4.

ICE is well aware of the record system that likely contains the responsive records. In a declaration filed with the Court on February 5, 2016, ICE explained that the TECS system contains ICE's case management database that stores investigative case files, and that the 5,564 seizure incidents listed on the summary table correspond to 1,085 TECS cases. Pineiro Decl. of Feb. 5, 2016, Doc. 20-1 ¶¶ 11-12. Although ICE knows that TECS contains responsive records, ICE has refused to search the TECS system. Indeed, ICE's declaration filed in support of its Motion for Summary Judgment fails to even mention the existence of TECS, other than to note that ICE redacted TECS codes from the documents produced, Pineiro Decl. of April 29, 2016, Doc. 26 ¶ 70, and the declaration does not indicate that *any* investigatory case files were searched for responsive documents. ICE's refusal to search the investigative case files in the TECS system is particularly egregious because Plaintiff identified for ICE the 25 entries from the summary table that were of greatest interest and offered to drastically reduce the scope of the request to minimize any burden. Exh. 12 at 2. Despite Plaintiff's offer to drastically reduce the scope of her request,

ICE refused to search the investigative case files, even with respect to the 25 items of greatest interest. Exh. 13.

To satisfy FOIA, ICE must conduct a search "reasonably calculated" to uncover all relevant documents and ICE must provide "reasonable detail" regarding the search and the methods used. *Oglesby v. U.S. Dep't of Army,* 920 F.2d 57, 68 (D.C. Cir. 1990). At minimum, ICE must expressly state that it searched all files "likely" to house documents responsive to Plaintiff's request. *Am. Immigration Council v. U.S. Dep't of Homeland Sec.,* 950 F. Supp. 2d 221, 230 (D.D.C. 2013). In *Perez-Rodriguez v. U.S. Dep't of Justice,* 888 F. Supp. 2d 175, 182-84 (D.D.C. 2012), this Court found an ICE search for responsive records to be inadequate based on a failure to comprehensively search the TECS system. Because the TECS system houses records responsive to the FOIA request at issue in this case but was not searched, ICE has failed to fulfill its search obligation under FOIA.

### C. ICE Did Not Search All Offices Thought to Have Responsive Records, and The Search Terms and Methods Used Varied Widely and Without Any Rational Basis.

ICE's search for responsive records was inadequate because the ICE FOIA office delegated responsibility for the search to a variety of record custodians without providing instruction on where or how to search. Indeed, ICE admits that it allows "employees [to] exercise discretion, based on their operational knowledge and subject matter expertise, in choosing the specific search terms utilized to ascertain whether or not potentially responsive documentation exists." Pineiro Decl. of April 29, 2016, Doc. 26 ¶ 42. ICE's delegation of search responsibility without any guidance or oversight resulted in searches that were unreasonably limited, haphazard, and arbitrary, and which failed to fulfill ICE's obligations under FOIA. The searches misconstrued Plaintiff's request and "contravene[d]

the government's duty to construct a FOIA request liberally." *Sack v. Dep't of Justice*, 65 F. Supp. 3d 29, 36 (D.D.C. 2014) (internal quotations and citations omitted) (finding an agency's narrow use of search terms was insufficient to prove it conducted an adequate search).

For example, the ICE FOIA Office sent Plaintiff's request to the ICE Office of Training and Development (OTD) and "instructed OTD to conduct a comprehensive search," but provided no further guidance. Pineiro Decl. of April 29, 2016, Doc. 26 ¶ 30. It is reasonable to believe that OTD would have records responsive to Request No. 2, which seeks, in relevant part, training materials that describe how ICE determines how similar one mark must be to another to deem an item bearing a mark counterfeit; distinguishes between items that are merely infringing items and items that are counterfeit; uses or considers circuit-specific case law in determining whether an item is counterfeit or infringing; considers the legal doctrine of fair use in determining whether an item is counterfeit or infringing; and considers trademark-infringement defenses other than fair use in determining whether an item is counterfeit or infringing. Exh. 8 at 1-2. However, OTD never conducted a search reasonably calculated to find records responsive to Request No. 2. Had it done so, OTD would have used search terms such as "trademark," "counterfeit," "infringing," "case law," "fair use," and "trademark-infringement defenses." Instead, OTD used the "search terms 'disparagement,' 'distortion,' 'tarnishment,' 'parody,' 'dist,' 'dip,' 'tarn,' and 'Modricker.'"  Pineiro Decl. of April 29, 2016, Doc. 26 ¶ 30. Although such terms might locate documents responsive to Request Nos. 3-6, such terms are not calculated to reveal records responsive to Request No. 2, which specifically seeks training documents likely held by OTD.

Similarly, the ICE FOIA Office tasked the Intellectual Property Rights (IPR) Center within the Office of Homeland Security Investigations (HSI) to respond to Plaintiff's FOIA Request, but provided no guidance on how to carry out the task. Subsequently, the Unit Chief searched her computer "using the terms 'Tushnet,' 'Modricker,' and 'counterfeit guides.'" Pineiro Decl. of April 29, 2016, Doc. 26 ¶ 44. A search using these three terms is not reasonably calculated to uncover documents relevant to Plaintiff's six-part FOIA request.

Further, according to ICE's search declaration, HSI "tasked all 26 HSI Special Agent in Charge filed offices to search for photographs responsive to item 1 and all potentially responsive records to items 2 through 6 of the request." *Id.* ¶ 45. ICE does not explain why it tasked only the 26 HSI field offices when documents produced by ICE show that 39 HSI offices participated in a nationwide operation aimed at seizing counterfeit sports merchandise. *See* Exh. 1 at 9 (listing 39 HSI offices with Operation Team Player investigations). The 39 HSI offices involved in that operation are likely to have documents responsive to Plaintiff's request, but only 17 of the offices identified in ICE's declaration as having been searched are among the 39 offices most likely to have responsive records. *Compare* HSI offices listed in Pineiro Decl. of April 29, 2106, Doc. 26 ¶ 46, *with* HSI offices listed in Exh. 1 at 9. Thus, 22 HSI offices likely to have responsive documents were not searched at all. Moreover, with respect to the 26 field offices asked to conduct a search, ICE's FOIA office provided no instructions on how to conduct the search; rather, the systems searched and the search terms used were "based on the judgment of the employee and their operational knowledge of the particular matter," Pineiro Decl. of April 29, 2106, Doc. 26 ¶ 46, which led to wildly divergent searches among the various offices. For

example, the Houston office used 24 search terms, the Denver office used 16, and the St.

Paul office used 15, while Boston, Detroit, Honolulu, Miami, New Orleans, New York,

Philadelphia, San Francisco, San Juan, and Seattle, used two terms or less. *Id.* Two offices

did not bother to respond at all. Only two offices—Houston and Los Angeles—used search

terms designed to locate photographs or documents related to the 25 seizure incidents

identified by Plaintiff as being of greatest interest. *Id.* Had all 26 offices conducted a robust

search, the number of responsive documents located would have been much higher. And

had ICE searched all 39 offices likely to have responsive material, instead of searching

only 17 of the 39 offices, the number of responsive documents located would have been

much higher. Thus, the searches ICE conducted are inadequate to fulfill FOIA's

requirement that an agency conduct a search "reasonably calculated to uncover all relevant

documents." *DeBrew*, 792 F.3d at 122.

## II.    ICE Has Not Shown that Exemption 7(E) Justifies Withholding Product Guides Provided by Industry Groups.

Exemption 7(E) allows an agency to withhold "records or information compiled for

law enforcement purposes, but only to the extent that the production . . . would disclose

techniques and procedures for law enforcement investigations or prosecutions, or would

disclose guidelines for law enforcement investigations or prosecutions if such disclosure

could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

ICE has failed to demonstrate that the information it redacted from guides provided to ICE

by private industry groups may be withheld under Exemption 7(E).

ICE has produced 24 industry guides totaling 503 pages, of which about 300 pages

have significant redactions under Exemption 7(E). The industry guides are listed on

Defendant's Vaughn Index, Doc. 26-1, Exhibit 12, as Entry Nos. 4-8, 10-12, 19, 21-22, 25-

28, 33, 35-37, and 39-43, and were provided to ICE by sports industry organizations such as the NFL, the NBA, the NHL, and MLB; by brands such as Nike, Adidas, and New Era; and by CAPS – the Coalition to Advance the Protection of Sports Logos. The industry guides purport to advise ICE agents on how to distinguish between authentic and counterfeit merchandise. *See* Pineiro Decl. of April 29, 2016, Doc. 26 at ¶ 71 (describing the guides as related to the "identification of clothing as counterfeit"). ICE has invoked Exemption 7(E) as its basis for redacting many different categories of information, including images of authentic and allegedly counterfeit jerseys and t-shirts, various details such as stitching, tags, and holograms, and descriptions of what to look for in distinguishing authentic from counterfeit merchandise. ICE's Vaughn Index does not distinguish between the various types of information redacted under Exemption 7(E); rather, it uses general and boilerplate language to cover hundreds of different redactions. The Exemption 7(E) redactions to the industry guides are addressed in a single conclusory paragraph of ICE's declaration, *id.* ¶ 71, which is cut and pasted into ICE's Memorandum of Law in Support of Defendant's Motion for Summary Judgment with no additional analysis. Def.'s Mem., Doc. 25 at 17-18.

The industry guides often contain disclaimers stating that they do *not* contain official policy or procedures for determining whether merchandise is counterfeit or authentic. One common disclaimer indicates that the guides express "opinions . . . of the right owner" and that "decisions as to whether or not merchandise should be detained or seized for infringing protected intellectual property rights are to be made in accordance with established procedures by [agency] personnel at the appropriate management level of the concerned field office." Exh. 14 at 1. Another disclaimer states that "[T]he information

provided above is for reference purposes only." *Id.* at 2. Others state that "[t]he opinions expressed herein are those of the right owner and do not necessarily reflect the position of [the agency]." *See, e.g.*, *id.* at 3.

The Court should reject ICE's claim that the information it redacted from the industry guides may be withheld under Exemption 7(E). First, ICE has failed to provide a Vaughn Index or declaration with sufficient detail to justify ICE's invocation of the exemption. Second, to the extent the industry guides encourage the seizure of items protected by the doctrine of fair use, they do not serve any legitimate law enforcement purpose. Third, ICE has failed to show how disclosure of the redacted information could risk circumvention of the law, because much of the redacted information is already in the public domain. Finally, ICE cannot support its contention that the guides are entitled to protection as law enforcement techniques, guidelines, or procedures, because the guides are not internal agency materials; rather, they were provided to express the opinions of private industry groups and the guides explicitly state that they do not constitute official law enforcement procedures.

### A.  ICE's Vaughn Index and Declaration Lack the Detail Required to Support Redactions Under Exemption 7(E).

Although ICE provided a Vaughn Index that purports to describe the information redacted under Exemption 7(E), and the reasons for the redactions, ICE has failed to provide "reasonably specific detail" sufficient to show "the information withheld logically falls within the claimed exemption." *See Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014). Instead, ICE uses a single, categorical description of the information withheld, and a generic recitation of the statutory standard as the reason for the redactions. ICE addresses its Exemption 7(E)

redactions to the industry guides in a single conclusory paragraph of its declaration, Pineiro Decl. of April 29, 2016, Doc. 26 ¶ 71, which is repeated almost verbatim in the only paragraph of ICE's Memorandum that addresses the issue. Def.'s Mem., Doc. 25 at 17-18.

With regard to identifying the material redacted, ICE's Vaughn Index lists the industry guides in 24 different entries, but uses the same description for every redaction within each guide, even though the redacted information falls into many different categories. Further, the Vaughn Index uses essentially the same language for every guide, stating that the redacted portions include "comparisons through photos, diagrams, and description of authentic and counterfeit branded merchandise," which "assist law enforcement in identifying counterfeit or authentic merchandise." *See, e.g.* Def.'s Vaughn Index, Doc. 26-1, Exhibit 12, Entry No. 10 (describing the redacted sections of a CAPS Product Identification Guide). Categorical descriptions are appropriate only when the categories are specifically defined and all of the circumstances they encompass support the agency's claim that the statutory exemption applies. *Citizens for Responsibility & Ethics in Washington*, 746 F.3d at 1088. Here, ICE's categorical description covers *all* the redactions, which include everything from examples of authentic merchandise, tags, and holograms, to examples of supposedly counterfeit or infringing items. The categorical approach used by ICE makes it impossible for Plaintiff or the Court to determine whether any of the redacted material is arguably subject to Exemption 7(E).

With regard to the reasons for the redactions, ICE's Vaughn Index and declaration provide no explanation of the law enforcement techniques or procedures supposedly implicated, how they would be disclosed by release of the redacted information, or how

release would risk circumvention of the law. For example, as its reasons for redacting information in an NFL Product Guide, ICE states:

> The information withheld serves as a guideline to law enforcement to compare authentic merchandise to counterfeit merchandise. The disclosure of the above information contains sensitive law enforcement techniques and procedures could reveal techniques and/or procedures [sic.] for law enforcement investigations or prosecutions, or disclose guidelines for law enforcement investigations or prosecutions which could reasonably be expected to risk circumvention of the law. Moreover, disclosure of these techniques and practices could permit people seeking to violate or circumvent the law by taking proactive steps to counter operational and investigative actions taken by ICE during enforcement operations. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. Specifically, if the information above, which includes techniques and procedures and guidelines, were exposed, the harm that would be caused is that individuals could circumvent the law by knowing how the investigation was conducted, and therefore counter operational and investigative actions taken by ICE during enforcement operations.

Def.'s Vaughn Index, Doc. 26-1, Exhibit 12, Entry No. 6. "This near-verbatim recitation of the statutory standard is inadequate." *Citizens for Responsibility & Ethics in Washington*, 746 F.3d at 1102. By failing to provide the detail and explanation necessary to justify its redactions under Exemption 7(E), ICE has failed to carry its burden and the Court should order ICE to release the redacted material.

**B.  To The Extent The Industry Guides Instruct ICE to Seize as Counterfeit Materials Protected by The Doctrine of Fair Use, The Guides Cannot Be Withheld Under Exemption 7(E).**

Industry guides that encourage ICE to seize material that is not actually counterfeit or illegal serve no valid law-enforcement purpose. Because such guides are not "related to the enforcement of federal laws" and there is no "rational nexus" between the redacted material and the agency's legitimate law enforcement duties, the information is not exempt from disclosure under Exemption 7(E). *See Jefferson v. Dep't of Justice*, 284 F.3d 172, 177

(D.C. Cir. 2002) (providing the test for the threshold determination under Exemption 7 of whether documents are compiled for law enforcement purposes). Although some of the redacted material within the industry guides may contain information for determining authenticity, there is substantial evidence that the guides also instruct ICE to seize items that are not counterfeit, but rather are items which include parodies or other uses of trademarks protected under the doctrine of fair use. Indeed, not all uses of a trademark without authorization are infringing; non-confusing uses, including parodies, are both legitimate and important to free expression and robust discourse about important elements of modern culture. As the leading treatise on trademark explains, "No one likes to be the butt of a joke, not even a trademark. But the requirement of trademark law is that a likely confusion of source, sponsorship or affiliation must be proven, which is not the same thing as a 'right' not to be made fun of." 2 J. McCarthy, *Trademarks and Unfair Competition* § 31:38 at 670 (2d ed. 1984); *see also Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1486-87 (10th Cir. 1987) ("Lardashe" jeans were protected parody of Jordache jeans). The court in *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410 (S.D.N.Y. 2002), noted the First Amendment rationale supporting this sensible rule:

> [T]he parodist is not trading on the good will of the trademark owner to market its own goods; rather, the parodist's sole purpose for using the mark is the parody itself, and precisely for that reason, the risk of consumer confusion is at its lowest. … [C]ourts have explained that:
>
> > Trademark parodies ... do convey a message. The message may be simply that business and product images need not always be taken too seriously; a trademark parody reminds us that we are free to laugh at the images and associations linked with the mark. The message also may be a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner.

... Even if not technically a parody, [Timmy Holedigger pet perfume] is at least a pun or comical expression—ideas also held to be entitled to First Amendment protection.

*Id.* at 414-15 (citations omitted).

Among the documents ICE produced is an NHL product guide identifying as counterfeit a shirt depicting the Philadelphia Flyers logo with the crossed hammers of the Chicago Blackhawks imposed over it, forming the message "No Flyers Zone." Exh. 15. This use of the Flyers' logo is protected because it cannot be confusing about the Flyers' sponsorship; thus, the shirt depicted as "counterfeit" in the industry guide is not an unlawful use of the mark. Guidelines provided by industry that promote a policy of seizing items protected by fair use are not related to the enforcement of federal law, have no rational nexus to ICE's law enforcement duties, and are not protected under Exemption 7(E). *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 340 (D.C. Cir. 1987) (finding that a claim under Exemption 7 is refutable by "persuasive evidence that in fact another, nonqualifying reason" exists for compiling the documents) (internal citations omitted).

Although the "No Flyers Zone" shirt described above was not redacted, there is reason to believe that material redacted from the industry guides includes similar examples of overreaching by trademark holders that is not protected under Exemption 7(E). For example, among the photographs ICE produced of items seized as counterfeit are several examples of items that should not have been seized, including a t-shirt containing a parody of the Chicago Bulls logo, Exh. 16; a t-shirt depicting Marilyn Monroe wearing a 49ers jersey, Exh. 17; a t-shirt bearing the message "49ers SFuck," Exh. 18; and a t-shirt with the San Francisco Forty-Niners logo crossed out, Exh. 19. These nonconfusing uses go beyond the statute's authorization for seizures of counterfeit or infringing merchandise. The fact

that ICE has seized such merchandise suggests that the industry guides encouraged ICE to do so, and the industry guides likely contain redacted images of such material. Further, as noted above, two different ICE Public Affairs Officers have stated—incorrectly—that where an item uses a team logo in a disparaging manner, or places one team logo above another, the item is infringing or counterfeit. *See* Exhs. 3 and 4. These ICE officials may have been influenced by material in the industry guides that has been redacted. Such material is unrelated to any legitimate law enforcement purpose and is not protected by Exemption 7(E).

### C. Disclosure of The Techniques and Procedures Described in the Industry Guides Do Not Risk Circumvention of the Law Because They Are Already Known to the Public.

"Exemption 7(E)'s protection is generally limited to techniques or procedures that are not well-known to the public." *See Justice Watch, Inc. v. U.S. Dep't of Commerce,* 337 F. Supp. 2d 146, 181 (D.D.C. 2004). In contrast, the material ICE has redacted from the industry guides is publicly available. The public has access to *authentic* merchandise and its attached tags and holograms because such items are marketed to the public through authorized dealers, both online and in brick-and-mortar stores. Similarly, techniques for identifying *counterfeit* merchandise are well-publicized, both by industry and ICE. Indeed, the FOIA request at issue had its genesis in a press conference held by ICE and the NFL to educate consumers about the differences between authentic and counterfeit goods. *See* Exh. 1. Given that ICE and industry both publicize images of authentic and counterfeit merchandise, it is clear that any techniques or procedures that could be derived from such images are already available to the public. *See Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1279 (D.C. Cir. 1992) ("[T]he government cannot rely on an otherwise valid

exemption claim to justify withholding information that has been 'officially acknowledged' or is in the 'public domain'").

ICE has failed to explain how the material it redacted from the industry guides that shows authentic merchandise differs from what is available publically on industry websites, if at all. For example, the CAPS website provides detailed information regarding sports team marks, events, logos, and official hangtags, stickers, and holograms, as well as providing detailed instructions for how to identify licensed merchandise. *See, e.g.*, CAPSInfo.Com, www.capsinfo.com (last visited May 20, 2016). On the NBA page, for example, in addition to pictures, CAPS provides detailed descriptions of holograms used for NBA licensed merchandise. Exh. 20.

Some of the information available on the CAPS website appears to be identical to information that ICE redacted from the industry guides. For example, the CAPS website displays for the public current and past authentic NHL tags and holograms, serial numbers, and concealed images, along with detailed instructions for how to identify authentic licensed merchandise. Exh. 21. ICE has produced an NHL product guide showing the same tags and holograms shown on the CAPS website, but has redacted under Exemption 7(E) certain text, serial numbers and concealed images. Exh. 22.

Even if there are secret procedures or techniques outlined in the industry guides for identifying *authentic* merchandise, which are unknown to the general public, ICE has given no reasonable explanation for how the images or descriptions of *counterfeit* merchandise in the industry guides might "increase the risk that 'a law will be violated or that past violators will escape legal consequences.'" *See Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary and Water Comm'n, United States-Mexico*, 740 F.3d 195 (D.C.

27

Cir. 2014). Indeed, ICE publically instructs consumers on how to identify counterfeit materials. For example, in a story run by a CBS station in Denver prior to the Super Bowl, an ICE agent shows a reporter authentic and counterfeit sportswear and demonstrates how to identify counterfeit merchandise, including by looking at the stitching and looking for holograms. *See* Jeff Todd, *Counterfeit Merchandise Targeted At Super Bowl 50*, CBS Denver, Febrary 3, 2016 11:55 PM, http://denver.cbslocal.com/2016/02/03/counterfeit-merchandise-targeted-at-super-bowl-50/ (embedded video). ICE has not shown how the specific techniques and procedures supposedly outlined in the redacted portions of the industry guides differ from those that are generally available to the public, such that they might fall within Exemption 7(E).

Finally, to the extent the redacted material in the industry guides contains more than photos or images but also contains text describing secret techniques or procedures for determining whether an item is authentic, ICE has not explained why the descriptions of secret techniques are not "reasonably segregable" from the rest of the image, such that the image may be released. 5 U.S.C. § 552(b) ("any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection"). Indeed, ICE has redacted entire images and pages of material, contrary to its claim that "only 2 pages were withheld in full." *See* Defendant's Statement of Undisputed Material Facts, Doc. 25, ¶ 21; *c.f.,* Exh. 23 (showing examples of 7 pages redacted in full and 9 pages redacting everything but a header). Indeed, ICE relies on a conclusory statement that all information not exempted from disclosure "was correctly segregated," Pineiro Decl. of April 29, 2016, Doc. 26, ¶ 74, which is insufficient to support ICE's contention that all information withheld is non-segregable. *Stolt-Nielsen Transp.*

*Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) (finding the agency's conclusory statement that only exempted material was withheld insufficient "for a court to conclude that the self-serving conclusion is the correct one").

ICE has failed to meet its burden of showing that the material withheld from the industry guides might risk circumvention of the law, particularly in light of the significant quantity of detailed information already available to the public detailing how to identify authentic and counterfeit materials. The Court should order ICE to release the redacted material.

### D. The Industry Guides Do Not Constitute Law Enforcement Techniques, Procedures, or Guidelines, Because They Are Not Internal Agency Materials.

Exemption 7(E) protection extends to law enforcement records that are "predominantly internal." *Milner v. Dep't of Navy*, 562 U.S. 562, 575 (2011). ICE makes no attempt to explain how guidance from private industry groups constitutes law enforcement "techniques or procedures" or even law enforcement "guidelines" such that they fall within Exemption 7. Instead, ICE simply states in a conclusory fashion that these external guides constitute such guidelines and contain such techniques and procedures. *See* Pineiro Decl. of April 29, 2016, Doc. 26 at ¶ 71 (stating that the release of information contained in the guides would result in the disclosure of "guidelines and techniques that law enforcement employ in investigating the illegal sale of counterfeit merchandise"). "[A]n agency may seek to block the disclosure of *internal* agency materials relating to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions." *Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002) (emphasis added). The industry guides are not internal agency materials and do not constitute official policy,

as shown through the use of explicit disclaimers stating that the industry guides "do not necessarily reflect the position" of the agency and that "decisions as to whether or not merchandise should be detained or seized for infringing protected intellectual property rights are to be made in accordance with established procedures" of the agency. Exh. 14. Thus, ICE has failed to show that the material redacted from the industry guides is entitled to protection under Exemption 7(E).

### III.     ICE Has Not Justified Its Withholdings Under Exemption 4, So The Redacted Material Must Be Released.

ICE withheld eight pages of material in its entirety pursuant to Exemption 4, 5 U.S.C. § 552(b)(4). Exh. 24. Exemption 4 allows an agency to withhold documents that contain "trade secrets and commercial or financial information obtained from a person that is privileged or confidential." 5 U.S.C. § 552(b)(4).  When withholding documents, "the agency bears the burden of justifying any withholding." *McKinley v. F.D.I.C.*, 756 F. Supp. 2d 105, 113 (D.D.C. 2010); *Bigwood v. U.S. Agency for Int'l Dev.,* 484 F. Supp. 2d 68, 74 (D.D.C. 2007). ICE has not even attempted to meet its burden. ICE does not mention the Exemption 4 withholdings in its Motion for Summary Judgement, Memorandum, Declaration, or Vaughn Index, let alone provide an explanation for the application of the exemption to the eight pages of withheld material. Because ICE has completely failed to justify any withholdings under Exemption 4, ICE has waived the claim and the Court should order the production of documents withheld pursuant to this exemption.

### CONCLUSION

The Court should grant Plaintiff's Motion for Summary Judgment and deny Defendant's Motion for Summary Judgment with respect to the adequacy of ICE's search for responsive records, and order ICE to conduct immediately a search reasonably

30

calculated to uncover the requested records. The new search should include a search of the investigatory case files in the TECS system, a search of all HSI offices involved in efforts to seize counterfeit sports merchandise, and the use of a uniform and comprehensive set of search terms reasonably calculated to find records responsive to all parts of Plaintiff's FOIA Request. The Court should grant Plaintiff's Motion for Summary Judgment and deny Defendant's Motion for Summary Judgment with respect to Defendant's Exemption 7(E) redactions of material from the industry guides, and order ICE to immediately produce the redacted material. The Court should grant Plaintiff's Motion for Summary Judgment with respect to the eight pages of material withheld in full under Exemption 4, and order ICE to immediately produce the withheld material.

Respectfully submitted,

_____/s/ Michael T. Kirkpatrick_____
Michael T. Kirkpatrick (DC Bar No. 486293)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Phone: (202) 662-9546
Fax: (202) 662-9634
Email: michael.kirkpatrick@law.georgetown.edu

Dated: May 20, 2016                *Attorney for Plaintiff*

31