# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **REBECCA TUSHNET,** | |
| Plaintiff, | |
| v. | Case No. 1:15-cv-00907 (CRC) |
| **UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,** | |
| Defendant. | |

## MEMORANDUM OPINION

Does a t-shirt with "Yankees Suck" emblazoned over the team's iconic logo violate federal trademark law?  An Immigration and Customs Enforcement ("ICE") spokesman appeared to suggest so in a press conference touting the agency's crackdown on counterfeit sports apparel before the 2015 Super Bowl.  Begging to differ, Harvard Law School professor Rebecca Tushnet explained to ICE that an irreverent parody of a recognized trademark does not infringe because it creates no confusion over the item's provenance.  See, e.g., Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 269 (4th Cir. 2007) (holding "Chewy Vuiton" dog toys not to infringe on the venerable handbag maker's trademark).  And when ICE's response failed to satisfy her that the agency was not confiscating lawful parody merchandise, Tushnet lodged a FOIA request seeking descriptions and photographs of seized apparel as well as documents instructing ICE agents on how to distinguish authentic goods from knock-offs.

Tushnet brought this action in June 2015 challenging ICE's failure to release records in response to her request.[1]  Since then, ICE has reviewed and released approximately 3,197

---

[1]  Tushnet was a professor at Georgetown University Law Center when she filed suit and was assisted by staff and students of the school's Institute for Public Representation.

photographs and 1,475 pages of responsive records.  With production complete as of June 2016,

both parties now move for summary judgment.  The motions present two remaining issues:  (1) the

adequacy of ICE's search for records, and (2) the applicability of FOIA's law-enforcement

exemption to certain material redacted from the released records.  The Court heard oral argument

on the motions on December 21, 2016.  For the reasons explained below, the Court cannot conclude

that ICE's original search was adequate because it failed to justify its decision not to search one of

its internal records systems and to support the scope of its searches across the agency's 26 field

offices.  The Court will therefore deny ICE's motion for summary judgment and reserve judgment

on Tushnet's motion with respect to the adequacy of ICE's search.  As for ICE's reliance on

FOIA's law-enforcement exemption, Tushnet has raised colorable but unresolved questions

concerning the appropriateness of the challenged redactions.  As a result, the Court will deny both

motions for summary judgment on this issue and order ICE to review the redactions in light of this

ruling.

I.      **Background**

        A.  The FOIA Request

        Prior to the 2015 Super Bowl, ICE held a press conference to publicize its efforts to seize

counterfeit sports-related apparel.  Pl.'s Statement of Material Facts ("SMF") ¶ 1; id., Ex. 1 (ICE's

January 29, 2015 Press Release).  As reported in the *Boston Globe*, ICE spokesman Daniel

Modricker announced that any item that "debas[es] a mascot—and really anything that denigrates a

team—is guaranteed to be contraband."  Id., Ex. 2 (Nestor Ramos, U.S. Agents Tackle Fake Super

Bowl Items, *Boston Globe*, Jan. 31, 2015).  The *Globe* article highlighted a "Yankees Suck" t-shirt

as an example of a piece of clothing that likely constituted trademark infringement and therefore

could be lawfully seized by ICE agents.  See id.  After reading the article, Professor Tushnet

immediately wrote to Modricker seeking clarification of ICE's position on parody merchandise.

Pl.'s Mem. Supp. Cross-Mot. Summ. J. ("Cross-MSJ") 3; see also id., Ex. 3.  Modricker doubled

down in his reply:  "if one logo [disparages] another logo than it would be infringement."  Id.

When pressed further on ICE's legal basis for seizing parody items, Modricker looped in

attorney Joseph Liberta, Chief of the agency's Criminal Law section.  Id., Ex. 6 (email chain

between Modricker, Tushnet, and Liberta).  And in a February 18, 2015 email, Liberta attempted to

assuage Tushnet's concerns by noting that ICE, in consultation with agency and Department of

Justice attorneys, relies on "potential fair use provisions and federal circuit-specific case law" when

determining whether probable cause supports a seizure.  Id., Ex. 7.  He invited Tushnet to submit a

FOIA request to obtain more information about the number of counterfeit seizures ICE had made in

recent history.  Id.  Two weeks later, Tushnet took him up on his offer, submitting a request for:

> (1) Images or descriptions of clothing seized by ICE as counterfeit from 2012 until present;
> (2) Training or guidance ICE agents receive on how to distinguish counterfeit goods, including explanations of legal doctrine and trademark-infringement defenses;
> (3) Records containing the words "disparagement," "parody," "distortion" or "tarnishment," in connection with trademark rights holders' requests;
> (4) Records indicating an item was seized because it disparaged, parodied, distorted or tarnished a trademark;
> (5) Documents used in connection with the news conference ICE held in January 2015; and
> (6) Records referencing spokesperson Modricker's statements about contraband items.

See id., Ex. 8 ("FOIA Request").[2]

B.  ICE's Search for Responsive Records

In a series of declarations, Fernando Pineiro, the ICE official responsible for handling all

FOIA requests submitted to the agency, detailed ICE's search for responsive records.  See Jan. 14,

2016 Decl. of Fernando Pineiro ("First Pineiro Decl.") ¶¶ 1–3; Feb. 15, 2016 Decl. of Fernando

Pineiro ("Second Pineiro Decl.") ¶ 1; April 29, 2016 Decl. of Fernando Pineiro ("Third Pineiro

---

[2] The Court will use this numbering when referring to the different components of Tushnet's request.  In the original request, item 2 was further divided into five sub-parts (numbered (a)-(e)), which are summarized here for simplicity's sake.  See FOIA Request.

Decl.") ¶ 1; June 30, 2016 Decl. of Fernando Pineiro ("Fourth Pineiro Decl.") ¶ 1.  For the portion

of request 1 related to descriptions of seized counterfeit items, ICE's FOIA office delegated the

search to the agency's Office of Homeland Security Investigations ("HSI"), which it determined

was most likely to have responsive records.  First Pineiro Decl. ¶ 14.  HSI in turn focused its search

on the Seized Asset and Case Tracking System ("SEACATS"), a database that tracks all property

seized by ICE from the time of the initial seizure.  Id. at ¶¶ 17–18.  Within SEACATS, every

"seizure incident"—which could include multiple seized items—is assigned a unique identifier and

a property category.  The database also contains a summary of the circumstances surrounding the

seizure and a brief (under 40 character) description of the seized items.  Id. at ¶¶ 19–21, 31.  HSI

queried SEACATS and produced a 511-page table of all clothing seized by ICE as counterfeit

goods between 2012 and March 2015.  Id. at ¶¶ 25, 27.  This summary reveals approximately 5,564

seizure incidents within that time period.  Id. at ¶ 31.  And these incidents correspond to

approximately 1,085 investigative case files created by ICE agents.  These case files are maintained

in a separate case management system, called TECS, which is used to store investigation reports

and other investigative records.  Second Pineiro Decl. ¶¶ 11–13.[3]  Because ICE apparently has no

way of estimating how many pages of records are contained in these 1,085 TECS case files and is

incapable of isolating records that contain item descriptions, it decided not to manually review the

files to determine if they contained additional descriptions of seized items beyond those found in

the SEACATS database.  Id. at ¶ 13.

_____

[3] TECS, which stood for the Treasury Enforcement Communication System, was originally managed by U.S. Customs and Border Protection.  It has since migrated to the Department of Homeland Security and is no longer considered an acronym but is simply known as TECS.  Second Pineiro Decl. at 4 n.1.

For the remaining parts of Tushnet's request, ICE identified several internal offices—including the Office of Training and Development, the Office of the Principal Legal Advisor, the Office of Public Affairs, and HIS—as likely locations of responsive records and tasked these offices with conducting searches "based on their knowledge of the manner in which they routinely keep records[.]"  Third Pineiro Decl. ¶ 21.  An ICE training office official searched shared computer files and email records using the terms "disparagement," "distortion," "tarnishment," "parody," "dist," "dip," "tarn," and "Modricker."  Id. at ¶ 30.  He also manually reviewed paper files for any relevant documents.  Id.  The Chief of the Criminal Law section conducted a similar search, using the search terms "Superbowl," "trademark seizures," "OPA," "Modricker," "Boston Globe," and "Tushnet."  Id. at ¶¶ 34–35.  The Public Affairs office searched computer files and email records using the terms "counterfeit," "trademarks," "distortion," "disparagement," "parody," and "Daniel Modricker."  Id. at ¶ 38.  Lastly, an HSI unit chief searched hard drives, shared network drives, and emails using the terms "Tushnet," "Modricker," and "counterfeit guides."  Id. at ¶ 40.  In addition to conducting these central-office searches, HSI provided Tushnet's FOIA request to its twenty-six regional field offices, which oversee sub-offices and supervise investigations into intellectual-property-rights violations, so that they could craft searches based on their documentation practices and local databases.  Each field office employed its own search methods, with some offices using just one or two search terms and others up to twenty four.  See Fourth Pineiro Decl. ¶¶ 11–12.[4]

---

[4] For example, the Boston field office only used the search terms "counterfeit" and "IPR," whereas the Houston office performed a broader search using the following terms:  "jerseys," "NFL," "shamrock," "Baltimore," "pong," "hoodies," "Steelers," "trademark," "sucks," "hat," "soccer," "jersey," "disparagement," "parody," "tarnishment," "distortion," "Rockets," "Texans," "ball caps," "Nike," "Adidas," "sports," "counterfeit," and "IPR."

Based on the results of these searches, ICE made "five rolling productions of material totaling 4,539 pages, consisting of 1,457 pages of text documents and 3,082 photographs of seized items." Pl.'s SMF ¶ 9. In response to request 1, which sought images or descriptions of seized items, ICE produced the 511-page table of item descriptions and 3,082 photographs. Id. at ¶ 17. Tushnet's counsel represented at oral argument though that the majority of these photographs were multiple images of the same item taken from different angles, so that the number of unique items shown in the photographs totaled a few hundred. In response to request 2(a), which sought training materials on how ICE agents could distinguish counterfeits, ICE produced 24 guides provided to ICE by various sports leagues and companies in the sports apparel industry, totaling 503 pages. Id. at ¶ 20. None of the documents produced were responsive to request numbers 2(b)-(e) (guidance on trademark-infringement defenses, the fair-use doctrine, and circuit-specific case law on trademark infringement), 3, and 4. Id. at ¶ 15. The last of the five rolling productions occurred in April 2016. Id. at ¶ 14. After it discovered that two of its field offices (Newark and San Antonio) had not yet completed their searches, ICE made one additional production of 133 pages to Tushnet in June 2016. Fourth Pineiro Decl. ¶ 10. In total, then, ICE has produced 1,475 pages of text documents and 3,197 photographs of seized items, along with a Vaughn index documenting its withholdings. Pl.'s Reply Cross-MSJ ("Reply") 2. ICE has partially redacted approximately 300 pages of the industry guides on the grounds that the undisclosed material is protected law-enforcement material under FOIA Exemption 7(E). See Third Pineiro Decl. ¶ 71. In addition, the agency originally withheld eight pages from the industry guides in their entirety pursuant to FOIA Exemption 4, but it has since released those documents with more limited redactions under Exemption 7(E). See Fourth Pineiro Decl. ¶ 15.

During the course of the search, Tushnet expressed concerns about the adequacy of ICE's search methods. Pl's SMF, Ex. 10. ICE clarified that its search was ongoing, but indicated that it

believed that several of the searches would be unduly burdensome.  See id., Ex. 11.  Tushnet

responded by offering to narrow the scope of the search.  Id., Ex. 12 at 1.  With respect to request 1,

Tushnet advised ICE that she sought only images and descriptions of items seized during the

months of January and December of 2012 through 2014 and any images and descriptions associated

with a list of 25 seizures reflected in the SEACATS summary table.  See id. at 2.  Likewise,

Tushnet sought only documents pertaining to sports apparel for request 2 and excluded from

requests 3 and 4 "any seizure case files that are not being reviewed in response to Request No. 1."

Id. at 5.  Tushnet estimated that the revised requests would result in a "narrowing of over 80% from

the original request."  Id.  ICE nonetheless declined to change its search methodology to

accommodate the narrowed requests.  See Pl.'s SMF, Ex. 13.

## II.  Legal Standard

FOIA requires that each "agency, upon any request for records which (i) reasonably

describes such records and (ii) is made in accordance with published rules ... shall make the records

promptly available to any person." 5 U.S.C. § 552(a)(3)(A).  To fulfill its disclosure obligations, an

agency must conduct a comprehensive search tailored to the request and release any responsive

material not protected by one of FOIA's enumerated exemptions, see § 552(b).  While an agency's

search must be adequate, Congress did not intend "to reduce government agencies to full-time

investigators on behalf of requesters."  Judicial Watch v. Export-Import Bank, 108 F. Supp. 2d 19,

27 (D.D.C. 2000).

FOIA cases are appropriately resolved at summary judgment.  See Brayton v. Office of U.S.

Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011).  Summary judgment can be awarded to the

government if "the agency proves that it has fully discharged its obligations under the FOIA, after

the underlying facts and inferences to be drawn from them are construed in the light most favorable

to the FOIA requester."  Gatore v. DHS, 177 F. Supp. 3d 46, 50 (D.D.C. 2016) (internal quotation

omitted).  An agency must show "beyond material doubt that its search was reasonably calculated to uncover all relevant documents." <u>Ancient Coin Collectors Guild v. U.S. Dep't of State</u>, 641 F.3d 504, 514 (D.C. Cir. 2011) (quoting <u>Valencia-Lucena v. U.S. Coast Guard</u>, 180 F.3d 321, 325 (D.C. Cir. 1999)) (internal quotation marks omitted).  A search is judged by the individual circumstances of each case.  <u>See</u> <u>Truitt v. Dep't of State</u>, 897 F.2d 540, 542 (D.C. Cir. 1990).  The central question is whether the search itself was reasonable, regardless of the results.  <u>See</u> <u>Cunningham v. DOJ</u>, 40 F. Supp. 3d 71, 83–84 (D.D.C. 2014).  Agencies need not scour every file cabinet and electronic database, but rather should conduct a "good faith, reasonable search of those systems of records likely to possess requested records." <u>Id.</u> (quoting <u>SafeCard Servs., Inc. v. SEC</u>, 926 F.2d 1197, 1201 (D.C. Cir. 1991)).  Agency declarations, especially from individuals coordinating the search, carry "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." <u>SafeCard</u>, 926 F.2d at 1200.

## III.  Discussion

Tushnet challenges both the adequacy of ICE's search for responsive records and its application of Exemption 7(E) in redacting pages of the industry guides used by agents to detect counterfeit apparel.[5]  The Court turns to each challenge below.

### A.  Adequacy of the Search

For a search to be adequate, "the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." <u>Campbell v. DOJ</u>, 164 F.3d 20, 27 (D.C. Cir. 1998).  Adequacy is "generally determined not by the fruits of the search, but by the appropriateness of the

---

[5] Initially, Tushnet also challenged ICE's invocation of Exemption 4 to withhold parts of the industry guides.  But because ICE has since released the documents previously withheld under Exemption 4, this issue is moot and need not be addressed here.

methods used to carry out the search," which an agency can establish by presenting affidavits and declarations that are submitted in good faith and are "relatively detailed and non-conclusory." Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003). "An agency affidavit can demonstrate reasonableness by 'setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'" Cunningham, 40 F. Supp. 3d at 83 (quoting Valencia–Lucena, 180 F.3d at 326). "An affiant who is in charge of coordinating an agency's document search efforts is the most appropriate person to provide a comprehensive affidavit in FOIA litigation." Id. at 84 (internal citation omitted). But a plaintiff can rebut an agency declaration by raising "substantial doubt[s] as to the reasonableness of the search, especially in light of 'well-defined requests and positive indications of overlooked materials.'" Cunningham, 40 F. Supp. 3d at 84 (quoting Founding Church of Scientology of Washington, D.C. v. NSA, 610 F.2d 824, 837 (D.C. Cir. 1979)).

      1.   Pineiro Declarations

     ICE supports the adequacy of its searches with a series of declarations from its Deputy FOIA Officer, Fernando Pineiro. Mr. Pineiro avers that he is familiar with Tushnet's request and outlines ICE's general process for responding to FOIA requests: The agency begins by reviewing the request and identifying which of its program offices are likely to have responsive records. ICE's FOIA Office then contacts liaisons within the relevant offices and provides them with a copy of the request, along with case-specific instructions if necessary. "Based on their experience and knowledge of their program office practices and activities, [the liaisons] forward the request and instructions to the individual employees or component offices within the program office that they believe are reasonably likely to have responsive records, if any." Third Pineiro Decl. ¶ 21. Any potentially responsive records are then turned over to the central FOIA office for processing. Id. Given ICE's size and breadth, this approach aims to locate the individuals most familiar with the

subject-matter of the request and permits them to customize their searches based on the way the particular office maintains its files. Id. at ¶¶ 22–26. As noted above, ICE followed this process when responding to Tushnet's request by delegating the search to the four ICE offices most likely to have responsive records: the Office of Training and Development, the Principal Legal Advisor's, the Office of Public Affairs, and HSI. Id. at ¶ 27. Pineiro maintains that each office conducted a search based "on [its] experience and knowledge of [its] . . . practices and activities[.]" Id. at ¶¶ 30, 33, 38, 42. Moreover, the declarations set out in detail the type of search each office performed (manual or digital), the types of records searched (paper, email, shared drives, or databases), and the search terms used, and they further assert that all locations reasonably likely to house relevant documents were searched. See id. at ¶¶ 29–47. The granularity of detail provided by Mr. Pineiro's declarations is far from conclusory and, if unrebutted, sufficiently establishes the adequacy of ICE's search.

Tushnet attempts to rebut the presumption of good faith accorded to agency declarations by pointing to a series of errors and inconsistencies found across Pineiro's multiple declarations. These errors include misstating the column headings contained in the agency's Vaughn index, the number of pages ICE produced by a certain date (2,749 as opposed to 2,784), and the dates ICE's FOIA Office tasked different offices with performing searches. Pl.'s Reply 3–4. Tushnet also points out that ICE initially failed to document the searches conducted by two of its 26 field offices or release responsive material they might have uncovered. See id. Although misstatements in an agency's FOIA response can portend an inadequate search, "[m]istakes alone do not imply bad faith." Leopold v. DOJ, 130 F. Supp. 3d 32, 42 (D.D.C. 2015) (citing Fischer v. DOJ, 723 F. Supp. 2d 104, 109 (D.D.C. 2010)). ICE is a complex organization and this particular request involved multiple parts, rolling productions, and coordinated searches across approximately 30 offices. A handful of inconsistencies is, therefore, unsurprising. Moreover, when notified that it had not

included the searches performed by two field offices, ICE's counsel stated at oral argument that the

agency promptly rectified its mistake by reaching out to the Newark and San Antonio offices and

producing additional records, which it described in a supplemental affidavit.  See Fourth Pineiro

Decl. ¶ 10.  "[An] agency's cooperative behavior of notifying the court and plaintiff that it had

discovered a mistake, if anything, shows good faith."  Leopold, 130 F. Supp. 3d at 42 (internal

quotation omitted).  Accordingly, the Court finds that the Pineiro declarations remain entitled to a

presumption of good faith.

2.  Reasonableness of Search

Tushnet also argues that "positive indications of overlooked materials" undermine the

reasonableness of ICE's search.  The Court considers each of these "indications" below.

i.  *Internal Training Guides*

As noted above, the only material that ICE produced in response to Tushnet's request for

training or guidance documents given to ICE agents were 25 instructional guides provided to ICE

by various sports leagues and sports apparel companies.  Tushnet finds it is "implausible that ICE

has no documents of its own" that instruct officers on how to distinguish counterfeit marks.  Pl.'s

Reply 7.  The Court does not share Tushnet's skepticism on this score.  It seems entirely logical that

ICE would rely on apparel licensers and manufacturers to point out the unique features of their

branded clothing, rather than to expend the resources necessary to develop those guidelines

internally.  Apart from Tushnet's unsupported claims to the contrary, then, she has not offered any

evidence that ICE has internal training guides that it failed to disclose or that the searches

conducted by its training and development office were not reasonably calculated to uncover

responsive documents.  If anything, the fact that the agency's searches uncovered private industry

guides on identifying counterfeits validates that the search terms they used adequately captured the

substance of the FOIA request.  Therefore, Tushnet's "[m]ere speculation that as yet uncovered

11

documents may exist does not undermine the finding that the agency conducted a reasonable search for them."  SafeCard, 92 F.2d at 1201 (quoting Weisberg v. DOJ, 745 F.2d 1476, 1486–87 (D.C. Cir. 1984).  Accordingly, the Court concludes that ICE has established the adequacy of its search for training and guidance documents.

> ### ii.    The TECS Database

Tushnet's next argument centers on ICE's failure to search the investigative TECS case management system for more detailed descriptions of the seized items catalogued in the SEACATS database.  Second Pineiro Decl. ¶ 11.  Pineiro avers that there are 1,085 TECS case files associated with the 5,564 seizures recorded in SEACATS, and that the files generally contain "reports of investigation . . . and other records related to an investigation."  Id. at ¶¶ 12–13.  Without discussing whether these reports would contain additional item descriptions, Pineiro implies that TECS was not searched because it would be unduly burdensome for the agency to manually review these files for responsive documents.  See id. at ¶¶ 13–14.  Months later, however, ICE claimed that the reason it did not search TECS was because all locations reasonably likely to uncover relevant descriptions had already been searched.  Def.'s Reply MSJ ("Reply") 10–11.

The Court is not persuaded by either justification offered by ICE for not searching the TECS system.  As for burdensomeness, Tushnet offered to narrow the scope of her request to 25 specific seizures listed in SEACATS as well as all seizures made in December or January.  According to Tushnet, this would have reduced the volume of materials for ICE to review by roughly 80%.  ICE insists that it was under no obligation to accept the offer in the first place because it "occurred only after ICE had conducted the search" and therefore had no bearing on its reasonableness.  Id. at 11.  But the record says otherwise.  Tushnet made her offer in October 2015.  See Pl.'s Cross-MSJ, Ex. 12.  ICE did not contact many of the offices that would be searching for documents until a month later.  See Fourth Pineiro Decl. ¶ 8 (ICE tasked field offices with searching for responsive records

on November 10, 2015).  And ICE admits that it was willing to accept Tushnet's offer as part of its settlement negotiations, which implies that the narrowed search would not be unduly burdensome. ICE therefore has failed to support its burdensomeness objection.

As to ICE's assertion that the TECS system is unlikely to contain additional responsive records, the agency has not explained why a full-length investigation report would not contain a more detailed description of seized items than a 40-character database summary.  The Court is therefore left unconvinced by the agency's conclusory justification for not searching for records stored in the TECS system.  Because ICE "cannot limit its search to only one record system if there are others that are likely to turn up the information requested[,]" Campbell, 164 F.3d at 28, the Court will deny ICE's motion for summary judgment on this issue and order ICE to review the TECS case files associated with the limited list of seizures that Tushnet has specified.[6]  ICE shall, within 60 days, either release any responsive material or renew its summary judgment motion with respect to the TECS search along with a supplemental declaration justifying its position.

*iii.   Field Office Search Terms*

Tushnet also challenges the adequacy of ICE's search on the grounds that widely varying search terms were used across the twenty-six field offices tasked with searching for responsive records.  Agencies generally have "discretion in crafting a list of search terms" as long as they are "reasonably tailored to uncover documents responsive to the FOIA request."  Bigwood v. DOD, 132 F. Supp. 3d 124, 140–41 (D.D.C. 2015) (quoting Agility Public Warehousing Co. K.S.C. v. NSA, 113 F. Supp. 3d 313, 339 (D.D.C. 2015)) (internal quotation marks omitted).  "Where the agency's search terms are reasonable, the Court will not second guess the agency regarding whether

---

[6] There appears to be some dispute as to whether the TECS system contains photographs of seized apparel.  To the extent it does, reviewing the TECS system might alleviate Tushnet's concern that ICE's search failed to reveal a sufficient number of photographs.

other search terms might have been superior." <u>Liberation Newspaper v. Dep't of State</u>, 80 F. Supp. 3d 137, 146 (D.D.C. 2015).

Here, ICE apparently presented its twenty-six field offices with Tushnet's FOIA request and no further instructions, giving them full discretion to search their records "based on their operational knowledge and subject matter expertise[.]" Def.'s SMF ¶ 16. The result was widely divergent searches, with several offices using one or two search terms and others conducting more comprehensive searches using 15 or more terms. <u>See</u> Third Pineiro Decl. ¶ 46 (reporting that the New York office used a single search term, the Miami office did not specify which or how many search terms it used, and the Houston office used twenty four). After comparing the terms used by these offices with Tushnet's FOIA request, the Court finds the selection of terms by many of the field offices to be facially lacking, with some not even including terms explicitly called out in Tushnet's request. <u>Compare id.</u> (New York only searched records for "counterfeit goods") <u>with</u> FOIA Request 2 ("All records that use the words "disparagement," "parody," "distortion," or "tarnishment," . . . in connection with trademark rights holders' requests[.]"). And ICE's declarations fall short of explaining why such disparate searches were reasonable for particular offices. The Court is left wondering, for example, why the Boston Office's choice to query its electronic files using solely the terms "counterfeit" and "IPR" was "reasonably tailored" to uncover documents responsive to all parts of Tushnet's request. Or why field offices with seemingly similar law enforcement responsibilities and activities would store records so differently that there would be little consistency among their searches. ICE's claim of "subject matter expertise" alone cannot resolve these questions. While FOIA might not require complete uniformity, it does require reasonable explanations for the scope of agency-wide searches. The wide and unexplained variances in the field offices' search parameters fall short of this standard. The Court will therefore order ICE to re-evaluate the searches conducted by its field offices, determine which were

inadequate in light of the discussion above, and provide those offices with additional guidance to conduct further searches.[7]  Within 60 days, ICE shall either release any newly uncovered responsive material or renew its summary judgment motion with respect to this issue.

  B. Application of Exemption 7(E)

   FOIA Exemption 7(E) authorizes agencies to withhold "records or information compiled for law enforcement purposes [that] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  "Satisfying the exemption is a 'relatively low bar' in this Circuit." Bigwood, 132 F. Supp. 3d at 152 (quoting Blackwell v. FBI, 646 F.3d 37, 42 (D.C. Cir. 2011)). "An agency need only demonstrate logically how the release of the requested information [may] create" a risk of circumvention.  Id.  And "where an agency specializes in law enforcement, its decision to invoke [E]xemption 7 is entitled to deference."  Barnard v. Dep't of Homeland Sec., 598 F. Supp. 2d 1, 14 (D.D.C. 2009) (quoting Campbell, 164 F.3d at 32).

   Invoking Exemption 7(E), ICE redacted over 300 of the 521 pages of the industry guides it released to Tushnet in response to part 2 of her request.  See Third Pineiro Decl., Ex 12 ("Vaughn Index") Entry Nos. 4–8, 10–12, 19, 21–22, 25–28, 33, 35–37, and 39–43; see also Fourth Pineiro Decl. ¶ 17.  ICE made the redactions on the grounds that the guides "were created specifically for the purpose of assisting law enforcement in the identification of counterfeit clothing items [by] . . . describ[ing] in detail through photographs, diagrams and descriptions, the features included in authentic authorized merchandise that indicate whether products are authentic."  Third Pineiro Decl.

---

[7] Enhancing the consistency of the field office searches might also resolve Tushnet's concerns around the relatively low number of photographs and documents produced in response to parts 2(b)-4 of her request.

¶ 71.   Therefore, according to the agency, "[d]isclosure of this information, which is not readily known by the public, could reasonably be expected to allow persons to circumvent the law and avoid detection of the sale of counterfeit merchandise by concealing the features that indicate products are counterfeit or attempting to imitate product features that indicate authenticity." Id.  On its face, ICE's justification appears sound:  If ICE agents use these guides to distinguish counterfeit goods, revealing the features they look for could help black market manufacturers improve the "authenticity" of their products and potentially avoid detection.  This explanation provides a straightforward link between disclosure and potential violations of the law.

Tushnet nonetheless raises four objections to ICE's justification of the exemption: (1) ICE's use of a general, categorical description in its Vaughn index to describe the 7(E) redactions are inappropriate;[8] (2) the redacted information is already known to the public; (3) the guides are not internal agency materials and therefore are not protected by 7(E); and (4) there is no legitimate law enforcement purpose in detecting non-counterfeit goods.  See Pl.'s Reply 12–17.

To Tushnet's first point, courts "have never required repetitive, detailed explanations for each piece of withheld information—that is, codes and categories may be sufficiently particularized to carry the agency's burden of proof." Judicial Watch, Inc. v. Food & Drug Admin., 449 F.3d 141, 147 (D.C. Cir. 2006) (internal citation omitted).  "Especially where the agency has disclosed and withheld a large number of documents, categorization and repetition provide efficient vehicles by which a court can review withholdings that implicate the same exemption for similar reasons." Id. The Court finds that ICE has met its burden here.  ICE's Vaughn index clearly identifies the

---

[8]  Tushnet specifically challenges ICE's use of the following statement when describing redactions in training guides: "The withheld information includes depictions and descriptions related to stitching, labeling, tagging, application of holograms, packaging, serial numbers, team and league logos, and brand logos that assist law enforcement in identifying counterfeit merchandise."  See generally Vaughn index.

redacted record, the exemption applied, the type of document at issue, the types of redactions made, and the underlying justification.  See Vaughn Index.  Although the descriptions do not specify what particular feature (e.g., stitching, holograms, serial numbers, or spelling) is discussed in each redaction, they provide enough information for the Court "to identify the records referenced and understand the basic reasoning behind the claimed exemptions[,]" which is all that is required. Morley v. C.I.A., 508 F.3d 1108, 1123 (D.C. Cir. 2007).

Second, Tushnet contends that the exemption cannot apply to information already available to the public, pointing specifically to images of authentic jerseys, which are obviously visible to the public in stores and online.  While this may be true, "[t]here is no principle of which the Court is aware that requires an agency to release all details concerning . . . [law enforcement techniques] simply because some aspects of them are known to the public."  Barnard, 598 F. Supp. 2d at 23. One could imagine ICE reasoning, for instance, that revealing a publicly available image along with a discussion of the features that distinguish authentic apparel from counterfeits would specifically highlight information to a black market manufacturer that an ordinary consumer might not notice. And given ICE's law enforcement expertise, its judgment on this issue is entitled to deference.  See Am. Immigration Council v. U.S. Dep't of Homeland Sec., 950 F. Supp. 2d 221, 245 (D.D.C. 2013) ("ICE is an agency specializing in law enforcement, and, consequently, its decision to invoke Exemption 7(E) is entitled to a measure of deference.").  The Court likewise finds Tushnet's third objection unavailing because ICE has plainly stated that the industry guides were "created specifically for the purpose of assisting law enforcement in the identification of counterfeit clothing items," which clearly qualifies them as "guidelines for law enforcement investigations" under Exemption 7(E) regardless of whether they were created by the agency itself.  5 U.S.C. § 552(b)(7)(E).

Tushnet's final objection fares better.  Returning to the genesis of her request, she maintains that some of the material redacted from industry guides might incorrectly characterize clothing as counterfeit when in fact it is a lawful parody.  Withholding such material would therefore serve no "legitimate law enforcement purpose" because ICE has no legal authority to seize these items.  Pl.'s Reply 14–15.  Tushnet points to a "No Flyers Zone" t-shirt that features the Philadelphia Flyers logo with the Chicago Blackhawks logo imposed over it as one example of an item that was mislabeled as counterfeit in one NHL product guide.  Id.  The use of the Flyers logo is lawful, according to Tushnet, "because there is no confusion as to whether the Flyers sponsored the shirt." Id. at 15.  In addition, Tushnet presents evidence that ICE has seized other items in this same vein, which suggests a potential misunderstanding within the agency as to what constitutes trademark infringement.  Id.  The examples offered by Tushnet give the Court pause because 7(E) redactions would be inappropriate if there is no risk that a law could be violated, see Am. Immigration Council, 950 F. Supp. 2d at 245; Campbell, 164 F.3d at 32, and successful parodies do not violate trademark laws.

To prove trademark infringement, the trademark owner must show "(1) that it owns a valid and protectable mark; (2) that [the alleged infringer] uses a 're-production, counterfeit, copy, or colorable imitation' of that mark in commerce and without [the trademark holder's] consent; and (3) that [the alleged infringer's] use is likely to cause confusion." Haute Diggity Dog, 507 F.3d at 259 (quoting 15 U.S.C. § 1114(1)(a)).  A parody, on the other hand, "relies upon a difference from the original mark, presumably a humorous difference, in order to produce its desired effect." Jordache Enterprises, Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1486 (10th Cir. 1987).  Therefore, a successful parody—one that is not likely to be confused for the trademark it parodies—would not violate a trademark holder's rights.  See id.  Given the evidence Tushnet has produced and the agency's apparently exclusive reliance on industry guidance to discern trademark infringement, the

Court finds that ICE has not sufficiently justified its 7(E) redactions and that a material factual dispute remains regarding the applicability of this exemption.  The Court will, accordingly, deny both motions for summary judgment on this issue and order ICE, within 60 days, to review its redactions in light of this ruling, release to Professor Tushnet any materials that it deems no longer protected by Exemption 7(E), and/or renew its summary judgment motion with respect to the redactions it continues to maintain.

## IV.   Conclusion

For the foregoing reasons, the Court will deny ICE's motion for summary judgment in its entirety and reserve judgment in part and deny in part Tushnet's cross-motion for summary judgment.  An Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   March 31, 2017

19